UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 05-10129-NG |
| | ) | |
| V. | ) | |
| | ) | |
| MALDEN BATTLE | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**MOTION TO SUPPRESS EVIDENCE**

The Defendant, MALDEN BATTLE, by his attorney, respectfully submits this Memorandum in Support of his Motion to Suppress Evidence.

**FACTUAL BACKGROUND**

On September 2, 2004 at approximately 8:30 a.m. Mr. Odemiro Rosa went to the Boston Police District 11 to report that Helena Fonseca, who lived at 14 Pearl Street, Apt. #24, was his former girlfriend, with whom he has recently reconciled. Mr. Rosa told the police that during the time that he and Ms. Fonseca were broken up, that she had a new boyfriend (who the police claimed to have later identified to be the defendant, MALDEN BATTLE); and that on August 21, 2004 Mr. Rosa went to Ms. Fonseca's apartment, where the individual pulled a firearm on him in the apartment. Mr. Rosa further reported to the police that Ms. Fonseca told him he could return to the apartment and that her former boyfriend was moving out. He informed the police that on September 1, 2004 at approximately 10:00 p.m. he went to 14 Pearl Street, Apt. #24 to check to see if the former boyfriend had moved out. When he went into the apartment and looked into a closet he saw two bags with clothing he believed belonged to the former boyfriend. He

1

moved the bags and observed a black firearm fallout of a small bag. He claimed he returned the firearm to the bag and left the apartment.

As a result of this report from Mr. Rosa on September 2, 2004 at approximately 8:30 a.m. the Boston police, led by Sgt. Detective Paul Donovan, Detective Gillespie and Detective MacCallum, together with Boston Police Officers Teixeira, Goff, Higgins, Miller and Cahill all responded to Apt. #24 to conduct a further investigation two hours later at 10:30 a.m. When the police arrived at 14 Pearl Street, Apt. #24 they knocked on the door, and the defendant, MALDEN BATTLE answered the door. He was wearing only gym pants, with no shirt nor shoes. The Sgt. Detective in charge of the investigation positioned two officers at the front door of the apartment and two at the back door. The defendant was held outside of the apartment while the police did a "protective sweep" of the apartment. (See Grand Jury Minutes p. 9, 10 annexed hereto). According to testimony given at the Grand Jury the defendant had been talking on the telephone to Ms. Helena Fonseca and Sgt. Detective Donovan told him to tell her to come back to the apartment. (See Grand Jury Minutes p. 16 annexed hereto). Thereafter, according to Sgt. Detective Donovan's testimony the defendant and officers went back into the apartment where Officer Goff read the defendant his Miranda rights. The defendant then telephoned someone who they believed to be his attorney. Sgt. Detective Donovan further testified that he then told the defendant he was "free to – free to go". He testified that the defendant got up from the couch turned and went to leave the apartment and Sgt. Detective Donovan went with him. He testified that Officer Cahill called him back into the apartment and "the couch had been moved a little bit at this point and Officer Cahill pointed to there was a black firearm sitting on the floor on the top of a white sock.

2

(Grand Jury Minutes p. 18 annexed hereto). Sgt. Detective Donovan then directed the Officers to handcuff the defendant. He then testified that he made the decision to take the handcuffs off the defendant (Grand Jury Minutes p. 18, 19 annexed hereto). Sometime thereafter Ms. Helena Fonseca arrived at the apartment. After discussions with Ms. Fonseca regarding the firearm, the police then put the handcuffs back on Mr. Battle to transport him to District 11. (Grand Jury Minutes p. 19 annexed hereto). Thereafter the police froze 14 Pearl Street, Apt. #24 as well MALDEN BATTLE's car in order to obtain search warrants. Sometime later that day the police obtained and executed search warrants of the aforesaid apartment and motor vehicle.

## ARGUMENT

### A.    The Warrantless Search Was Not Part Of A Valid Protective Sweep

It is a well established principle of Fourth Amendment law that warrantless searches inside a home are a presumptively unreasonable. Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Even with probable cause to believe that evidence of crime may be found within a private dwelling, the constitutional protections afforded to an individual's privacy interest in his own home out ways the Government's interest in crime prevention. Id. @ 588-89.

Though under certain circumstances a warrantless entry into a persons home may be permitted, none of those circumstances were present in the case at bar. In the instant case it is clear that the Boston Police went to the apartment in question, Apt. #24 at 14 Pearl Street where the defendant had resided with Ms. Helena Fonseca. They had neither an arrest warrant nor a search warrant when they went to the apartment on September 2, 2004. It is clear from the testimony at the Grand Jury, that the police went to the

apartment for further investigation; that they knocked on the apartment door, and when the defendant answered the door they immediately did a "protective sweep". The Supreme Court has defined a "protective sweep" as a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."  Maryland v. Buie, 494 U.S. 325, 327, 108 L. Ed. 2d 276, 110 S. Ct. 1093 (1990). Hence, "The searching officer must possess a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts reasonably warrant the office in believing…that the area swept harbored an individual posing a danger to the officer or others." Buie, 494 U.S. @ 327. Although Buie concerns protective sweeps incident to arrest, this court has extended this doctrine to include protective sweeps in conjunction with the execution of search warrants, U.S. v. Jimenz, 419 F.3d (1st Cir. 2005) citing Drohan v. Vaughn, 176 F.3d 17, 22 (1st Cir. 1999); United States v. Daoust, 916 F.2d 757, 759 (1st Cir. 1990) and recently to include protective sweeps where the assistance of exigent circumstances prompts the entry of police, United States v. Martins, 413 F. 3d 139, (1st Cir. 2005).

      In this case the police do not admit that they had "arrested" Mr. Battle at the time they did their protective sweep. (Arguably he was under arrest where he was taken outside the apartment in the presence of at least two other officers while other officers entered the apartment.) Nor was there any search warrant presented at that time, and so the protective sweep was not conducted pursuant to the execution of a search warrant. Nor were there any exigent circumstances warranting a "protective sweep". In fact the police did not discover any firearm or other contraband in their protective sweep, nor did they discover any other individual in the apartment.

4

A protective sweep must be "narrowly confined to a cursory visual inspection of those places which a person might be hiding" and can last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises". Maryland v. Buie, @ 327, 335.36.

**B.    There Were No Exigent Circumstances So As To Permit A Warrantless    Search.**

A warrantless police entry into a residence is presumptively unreasonable unless it falls within the compass of one of a few well delineated exceptions. United States. v. Romain, 393 F.3d 63, 68 (1st Cir. 2004). Some of these exceptions are bundled together under the heading of "exigent circumstances" a heading that encompasses those situations in which some compelling reason for immediate action excuses law enforcement officers from pausing to obtain a warrant. United States v. Martins, 413 F.3d 139. "Common examples of exigent circumstances include (1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat posed by a suspect in lives or safety of the public, the police officers or to themselves. Martins citing Hegarty v. Sommerset County, 53d F.3d 1367 (1st. Cir. 1995). There are no facts in the case at bar that constitute "exigent circumstances". Clearly there was no "hot pursuit" of Mr. Battle. The police came to his door and knocked on his door. Nor was there any threat that evidence inside the residence would be destroyed before a warrant could be obtained. The police testified at the Grand Jury that they had secured the apartment, taken the defendant outside in the custody of police officers, and conducted a "protective sweep". At no time was there any other person in the apartment that could have destroyed evidence, and certainly the defendant who was at all times in

5

the custody of the police in any position to destroy any evidence. Likewise there was no risk that Mr. Battle would flee from the residence undetected, or that he posed a threat to the lives and safety of the public, the police or himself. As testified by Sgt. Detective Donovan, numerous police officers were on hand this day, with at least two officers stationed at both the front and back entrances of the apartment and several police officers in the apartment. Accordingly there was no exigency allowing this warrantless, illegal search of the apartment.

### C. There Was No Consent To The Warrantless Search.

At no time in their testimony before the Grand Jury do the police ever indicate that Mr. Battle consented to the search of the apartment. Nor do they suggest that Ms. Helena Fonseca, when she arrived at the apartment gave a consent to search the same. Instead, the police suggest that they returned later that day with a warrant for a search of the apartment as well as the motor vehicle belonging to the defendant.

### D. Any Evidence Seized Pursuant To Subsequent Search Warrants Should Be Suppressed As Fruits Of The Poisonous Tree.

According to the testimony at the Grand Jury by the Boston police officers in this case, as well as police reports prepared, they received information from Mr. Rosa at approximately 8:30 a.m. on the morning of September 2, 2004. Mr. Rosa did not know the name of the defendant, when he provided the police with the information about an individual with a gun at the apartment. Further, there was no indication at all that Mr. Rosa was a reliable informant or had provided information to the police in the past that was reliable. The police did not go to the apartment to conduct further investigation until 10:30 a.m. on September 2, 2004. There is no explanation provided for the two hour delay, or any suggestion that the police had obtained a warrant either for the arrest of Mr.

6

Battle, or a search warrant for the apartment prior to going to the apartment on that day at 10:30 a.m.  Clearly the information they had did not constitute probably cause sufficient to obtain either an arrest warrant or a search warrant.  Probable cause cannot be based on conclusory statements, or mere "suspicion, rumor or strong reason to suspect wrong doing" United States v. Vigeant, 176 F.3d 565, 569 (1st Circ. 1999)  Uncorroborated tips are often insufficient to provide a reasonable basis to enter a persons home and the police are often justified in waiting for corroboration before making an application to a magistrate for a warrant.  U.S. v. Samboy, 205 U.S. App. LEXIS 28892 (December 29, 2005) citing United States v. Capozzi, 347 F.3d 327, 333 (1st. Cir. 2003) (Reliance on an anonymous source required police to attempt to corroborate the informants story under the totality of the circumstances). It is clear the police did not believe that Mr. Rosa's tips alone were sufficient to obtain a search warrant, or to arrest in individual of whom he complained.  Certainly the police had a right to conduct further investigation and to seek additional corroboration before seeking either a search warrant or an arrest warrant.  The problem, however, is that the police did much more.  The police entered the dwelling unit, conducted a search, not only once but twice, and only after discovering a firearm did they then use that information in order to apply for the search warrant.

   The police claim that they had Mr. Battle held outside the apartment while they did their "protective sweep".  They then claim that they brought him back into the apartment to question him, read him his rights, and then curiously tell him he was free to leave.  They remained in the apartment, and allegedly discovered a gun under a sofa after Mr. Battle had left the apartment.  They then claim to have put handcuffs on Mr. Battle and held him for a period of time, and then removed the handcuffs from Mr. Battle and

7

again allegedly told him he was free to leave. The police claim that it was only after Ms. Helena Fonseca arrives, at their request, and provides them with information that they then arrest Mr. Battle.

It is abundantly clear that the police used the illegal and warrantless searches in order to obtain the search warrants in this case, and accordingly anything obtained pursuant to those warrants should likewise be suppressed, as fruits of the poisonous tree. <u>Wong Sun v. United States, 371 U.S. 471 (1963)</u>.

## CONCLUSION

For the foregoing reasons the defendant requests that this Honorable Court suppress the evidence seized pursuant to the warrantless searches in this case, as well as the evidence seized pursuant to the search warrant that was tainted and constituted the fruits of the poisonous tree.

Respectfully submitted,
By his Attorney,

Dated:  January 9, 2006

<u>Eileen M. Donoghue</u>
Eileen M. Donoghue
112 Middle Street
Lowell, MA  01852
(978) 458-7070
BBO# 130040

9

1  that location?
2  A  Yes. When we arrived Sergeant Detective Paul Donovan
3     knocked on the door and answering the door later --
4     we later identified -- who was later identified as
5     Malden Battle, opened the door and spoke with us.
6  Q  How was he dressed?
7  A  He had, I believe, had just gym pants on and he was
8     with no shirt.
9  Q  What happened next?
10 A  At that point, as far as I can recall, he had a phone
11    in his hand. And right at that point he called
12    Helena Fonseca.
13 Q  Do you know what he told Helena Fonseca?
14 A  I believe he said, "What's going on? I have
15    permission to be here. Helena, what's going on?"
16 Q  What was the next step in the investigation?
17 A  The next step, Sergeant Donovan I believe asked Mr.
18    Battle to ask Helena Fonseca to come to the
19    apartment.
20 Q  After that took place, what was your responsibilities
21    or duties at the scene of 14 Pearl Street, Apartment
22    24?
23 A  At that point, we did a protective sweep of the
24    apartment for the safety of the officers.

10

1  Q  Did you take part in that protective sweep?
2  A  Actually, I stood outside with Mr. Battle.
3  Q  How was Mr. Battle towards you? Was there any
4     confrontation? Was he cordial? Were there any
5     problems with him outside?
6  A  No, no problem.
7  Q  Did he make any statements to you while he was
8     waiting outside?
9  A  No, he didn't.
10 Q  Thank you, Officer.
11       MR. REIDY: I no additional questions.
12       Do any members of the Grand Jury have any
13    questions for Officer Teixeira?
14       (No response from Jurors)
15       Thank you.
16       THE WITNESS: You're welcome.
17
18              PAUL DONOVAN, SWORN
19 Q  (By Mr. Reidy) In a loud, clear voice, could you
20    please introduce yourself to the members of the Grand
21    Jury, spelling your last name for the record.
22 A  My name is Paul R. Donovan, D-O-N-O-V-A-N.
23 Q  How are you employed?

11

1  A  I'm a Sergeant Detective with the Boston Police
2     Department assigned to District 11 in Dorchester.
3  Q  How many years have you been a member of the Boston
4     Police Department?
5  A  Eighteen years.
6  Q  How many years have you been a Sergeant Detective?
7  A  Twelve.
8  Q  Could you briefly describe your duties and
9     responsibilities as a Sergeant Detective at Area
10    C-11?
11 A  I'm assigned to the day shift at District 11. I have
12    a squad of detectives who investigate reports of
13    crime in the District 11 area. They include
14    robberies, various types of assault, from assaults
15    with a firearm, a knife, simple assault and battery,
16    breaking and entering of residents and commercial
17    businesses, vehicles.
18 Q  I want to draw your attention to September 2 of 2004.
19    Were you working on that date?
20 A  I was.
21 Q  What shift were you working?
22 A  The day tour; 7:30 a.m. to 4 p.m.
23 Q  And at a point sometime after 8:30 in the morning on
24    September 2, 2004, did you become aware of an

12

1     interview that Officer John Teixeira had with one
2     Odemiro Rosa?
3  A  Yes.
4  Q  It's fair to say that you become involved to assist
5     in the investigation of that incident; is that fair
6     to say?
7  A  Correct.
8  Q  Did you take part in an interview with Mr. Rosa with
9     Officer Teixeira translating at the Area C-11
10    Detectives Unit?
11 A  Yes.
12 Q  If you could briefly summarize the information that
13    you gathered from that interview?
14 A  He reported through Officer Teixeira that he had had
15    a girlfriend that lived at 14 -- I forgot the name of
16    the street -- Pearl Street.
17 Q  14 Pearl Street?
18 A  14 Pearl Street, Apartment 24. And that she -- she
19    had a new boyfriend. Back in August -- I believe it
20    was August 21, he had an encounter with that
21    boyfriend he described as a black male about six-feet
22    tall, kind of heavy, muscular build with braids.
23    That he had pulled a -- they had an encounter in the
24    apartment and he pulled a firearm on him at that

Page 9

```
 1   that location?
 2  A  Yes. When we arrived Sergeant Detective Paul Donovan
 3     knocked on the door and answering the door later --
 4     we later identified -- who was later identified as
 5     Malden Battle, opened the door and spoke with us.
 6  Q  How was he dressed?
 7  A  He had, I believe, had just gym pants on and he was
 8     with no shirt.
 9  Q  What happened next?
10  A  At that point, as far as I can recall, he had a phone
11     in his hand. And right at that point he called
12     Helena Fonseca.
13  Q  Do you know what he told Helena Fonseca?
14  A  I believe he said, "What's going on? I have
15     permission to be here. Helena, what's going on?"
16  Q  What was the next step in the investigation?
17  A  The next step, Sergeant Donovan I believe asked Mr.
18     Battle to ask Helena Fonseca to come to the
19     apartment.
20  Q  After that took place, what was your responsibilities
21     or duties at the scene of 14 Pearl Street, Apartment
22     24?
23  A  At that point, we did a protective sweep of the
24     apartment for the safety of the officers.
```

Page 10

```
 1  Q  Did you take part in that protective sweep?
 2  A  Actually, I stood outside with Mr. Battle.
 3  Q  How was Mr. Battle towards you? Was there any
 4     confrontation? Was he cordial? Were there any
 5     problems with him outside?
 6  A  No, no problem.
 7  Q  Did he make any statements to you while he was
 8     waiting outside?
 9  A  No, he didn't.
10  Q  Thank you, Officer.
11              Do any members of the Grand Jury have any
12     questions for Officer Teixeira?
13              MR. REIDY: I no additional questions.
14              (No response from Jurors)
15              Thank you.
16              THE WITNESS: You're welcome.
17
18                     PAUL DONOVAN, SWORN
19
20  Q  (By Mr. Reidy) In a loud, clear voice, could you
21     please introduce yourself to the members of the Grand
22     Jury, spelling your last name for the record.
23  A  My name is Paul R. Donovan, D-O-N-O-V-A-N.
24  Q  How are you employed?
```

Page 11

```
 1  A  I'm a Sergeant Detective with the Boston Police
 2     Department assigned to District 11 in Dorchester.
 3  Q  How many years have you been a member of the Boston
 4     Police Department?
 5  A  Eighteen years.
 6  Q  How many years have you been a Sergeant Detective?
 7  A  Twelve.
 8  Q  Could you briefly describe your duties and
 9     responsibilities as a Sergeant Detective at Area
10     C-11?
11  A  I'm assigned to the day shift at District 11. I have
12     a squad of detectives who investigate reports of
13     crime in the District 11 area. They include
14     robberies, various types of assault, from assaults
15     with a firearm, a knife, simple assault and battery,
16     breaking and entering of residents and commercial
17     businesses, vehicles.
18  Q  I want to draw your attention to September 2 of 2004.
19              Were you working on that date?
20  A  I was.
21  Q  What shift were you working?
22  A  The day tour; 7:30 a.m. to 4 p.m.
23  Q  And at a point sometime after 8:30 in the morning on
24     September 2, 2004, did you become aware of an
```

Page 12

```
 1     interview that Officer John Teixeira had with one
 2     Odemiro Rosa?
 3  A  Yes.
 4  Q  It's fair to say that you become involved to assist
 5     in the investigation of that incident; is that fair
 6     to say?
 7  A  Correct.
 8  Q  Did you take part in an interview with Mr. Rosa with
 9     Officer Teixeira translating at the Area C-11
10     Detectives Unit?
11  A  Yes.
12  Q  If you could briefly summarize the information that
13     you gathered from that interview?
14  A  He reported through Officer Teixeira that he had had
15     a girlfriend that lived at 14 -- I forgot the name of
16     the street -- Pearl Street.
17  Q  14 Pearl Street?
18  A  14 Pearl Street, Apartment 24. And that she -- she
19     had a new boyfriend. Back in August -- I believe it
20     was August 21, he had an encounter with that
21     boyfriend he described as a black male about six-feet
22     tall, kind of heavy, muscular build with braids.
23     That he had pulled a -- they had an encounter in the
24     apartment and he pulled a firearm on him at that
```

13

1  point. He didn't report it to the police.
2      And subsequent to that, his girlfriend come back
3  to him, said, "This guy's moving out, you know,
4  you're welcome to come back." They had a young child
5  together. He had keys to the apartment. So he told
6  Officer Teixeira that on September 1 at about 10
7  p.m., he went back to 14 Pearl Street, Apartment 24
8  to see if this male had, in fact, moved out.
9      He entered the apartment with a set a keys that
10 were given to him by his girlfriend, Helena Fonseca.
11 And he was looking about the apartment to see if the
12 -- there was no one there. He looked about -- around
13 the apartment. He located a couple of bags in the
14 closet that he believed belonged to this black male.
15 And then while inspecting the bags there was some
16 clothing, and he discovered a firearm.
17 Q   It's fair to say that as a result of this incident
18 you authored a number of police reports; correct?
19 A   Correct.
20 Q   I'm going to show you 040468100, which is dated
21 September 2, 2004.
22     Do you recognize that?
23 A   Yes. That's a report I completed.
24     MR. REIDY: If I could get this marked as

14

1  Exhibit Number 2.
2          (Exhibit No. 2 marked; Incident Report -
3          9-2-04 - Paul Donovan)
4  Q   Now, Sergeant Detective Donovan, it's fair to say
5  there is a typographical error in regards to the
6  first line of this Incident Report; correct?
7  A   That is correct.
8  Q   Could you explain to the Grand Jury what you mean?
9  A   Well, on -- I wrote this report on September 2. The
10 victim came in on September 2. And he had reported
11 that he had returned to 14 Pearl Street on September
12 1. But I made a typographical error when I typed
13 this out, and instead of September 1, I put September
14 2, and didn't notice that until a later time.
15 Q   Now after you received this information from Mr.
16 Rosa, what did you and your detectives decide to do?
17 A   We talked about it and we decided that we were going
18 to back. Well, we were going up to 14 Pearl Street.
19 At that time, based on the information we had from
20 the victim, we anticipated that there wasn't going to
21 be anybody there, and we wanted to see what -- what
22 was at 14 Pearl Street. So we -- we got a group of
23 officers together. I believe we had four, six, eight
24 -- eight officers, and we went back up to 14 Pearl

15

1  Street.
2  Q   Did you knock on the door?
3  A   We did. I had put two officers out front and two
4  officers out back. Four -- four of us went to and
5  knocked on the door to 14 -- 14 Pearl, Apartment 24
6  and announced ourselves, that the police were
7  present. And a black male answered the door. He was
8  bare-chested, had a pair of pants on, and he was in
9  bare feet.
10 Q   Did you have a conversation with this person?
11 A   Yes. He pretty much right away, you know, he knew we
12 were the police. So we had one uniformed officer
13 with us and -- or two uniformed officers, actually.
14 And he -- right away kind of just -- he spurted --
15 spurted out, you know, "Oh, I got permission to be
16 here. My girlfriend gave me permission to be here."
17 Told him to step -- step out to the door and directed
18 -- myself and the other -- a couple of the other
19 officers went in. And at that point, we conducted a
20 protective sweep of the apartment to determine if
21 there was anyone present in the apartment.
22 Q   Was there anyone else present?
23 A   No. There was no one else present in the apartment.
24 Q   At some point, did you have a conversation with this

16

1  male?
2  A   Returned back out to the door. Officer Teixeira was
3  there with this black male. We didn't -- we didn't
4  know who he was at that point. And he was on his
5  cell phone talking to someone. And I believe I said
6  to Officer Teixeira -- I'm like, "Who's he talking
7  to?" He said, "He's talking to the girl." So I told
8  him -- I said, "Tell -- tell her I want her to come
9  -- come back here to the apartment."
10 Q   That was Helena Fonseca?
11 A   Yes.
12 Q   What happened next?
13 A   So he did that. We went back into the apartment. He
14 sat down on -- on the couch. There was a couch in
15 the living room and some other chairs and furniture.
16 He sat down on the couch; I sat down on the chair.
17 He was -- he was advised -- we were getting
18 some, you know, personal information from him, trying
19 to determine who he was. He was advised --
20 one of the officers, Officer Goff, I believe it was,
21 he -- he advised him of his rights, his
22 Miranda rights.
23     At some point, he got on the phone, on his cell
24 phone. He pulled out his cell phone again, and he

Page 17:

```
 1   got on the cell phone.  And it was apparent he was
 2   trying to contact his attorney.  It sounded like he
 3   was leaving him a voice mail.  He had got his voice
 4   mail and he's talking to him on the voice mail.  And
 5   then ----
 6  Q  Did Mr. Battle make a statement to you in regards to
 7     what time he had arrived at that apartment?
 8  A  Yes.  Well, I was sitting there talking to him and
 9     getting his personal information.  He said that he
10     was -- he was moving -- he was moving out of the
11     apartment.  He'd returned at about three o'clock in
12     the morning for purposes of gathering his belongings,
13     his clothing.  He had moved those out to his car
14     which was parked up on Pearl Street.  And he had come
15     back at 3:00, and he hadn't left since then.
16  Q  He indicated that he had attempted to contact his
17     attorney via the phone.  And he stated he did not
18     want to say anything else until he spoke with his
19     attorney?
20  A  When he got off -- when he was on the phone, it
21     became apparent that he was talking to his attorney,
22     and that he left him a voice mail asking the attorney
23     to contact him back.  He got off the phone, and he
24     stated that he did not wish to make anymore
```

Page 18:

```
 1   statements until he spoke with his attorney.  And
 2   that was the end of the questioning at that point.
 3  Q  What did you do next?
 4  A  I told him he was -- he was free to -- free to go.
 5     And he got up from the couch, and he turned, and he -
 6     - he went to leave the apartment.
 7  Q  Did he leave the apartment?
 8  A  He did.  He got out to like the threshold to the hall
 9     of the apartment building.  And I exited with him.
10     And then my attention was brought back to the
11     apartment.  They wanted me back inside the apartment.
12     I went back into the apartment where Officer Cahill
13     directed me to the floor of the apartment.  The couch
14     -- the couch had been -- been moved a little bit at
15     this point and Officer Cahill pointed to -- there was
16     a firearm, a black firearm, sitting on the floor on
17     top of a white sock.
18  Q  After you were notified of this, what did you do?
19  A  I -- I directed the officers to -- to handcuff the
20     black male, who'd by now we had determined was a
21     Malden Battle.
22     He also had another name of Atta Ul-Ahmed, which is
23     spelled A-T-T-A, U-L, hyphen, A-H-M-E-D?
24  A  That was a name he had used in a previous incident
```

Page 19:

```
 1   with the police.
 2  Q  After you had Mr. Battle handcuffed, what did you do?
 3  A  At that point he was out in the hallway.  I went back
 4     in discussing the incident further with a couple of
 5     the officers.  And at that point, I -- I made the
 6     decision to take the handcuffs -- handcuffs off of
 7     Mr. Battle.
 8  Q  Did Mr. Battle stay at the scene?
 9  A  He did.  He remained out in the hallway with -- with
10     one of the officers, Officer Goff.
11  Q  Did Helena Fonseca arrive at 24 Pearl Street?
12  A  She did.  She arrived at 24 Pearl Street.  She went
13     into the kitchen area of -- of 24 Pearl Street with
14     Officer Teixeira and had a conversation with Officer
15     Teixeira.
16  Q  Was a statement provided by Helena Fonseca?
17  A  She advised Officer Teixeira that the firearm that
18     was sitting on the floor of the apartment now, that
19     she had observed Marvin -- Malden Battle with that
20     firearm on previous occasions -- on two previous
21     occasions, I believe.
22  Q  As a result of that information, what did you do?
23  A  I directed the officers to put the handcuffs back on
24     Mr. Battle and transport him to District 11.
```

Page 20:

```
 1  Q  Did you freeze 24 Pearl Street, Apartment Number 2,
 2     as well as Malden Battle's car in order to obtain a
 3     search warrant?
 4  A  I did.  When I -- when I told -- when Mr. Battle
 5     informed me that he didn't wish to answer anymore
 6     questions, I advised him that he was free to go and
 7     that we were going to be conducting a search warrant.
 8     We were going to apply for a search warrant on this
 9     apartment, and that he was free to go.  And it was
10     kind of -- at that point he -- he said, "Well, I
11     don't want to leave."  He goes, "I want to -- I want
12     to stay."  I said, "Well, you can't stay.  You have
13     to leave."  And we got into a discussion on to -- as
14     to why he had to leave.  And I explained to him it
15     was for officer's safety purposes for one reason,
16     and then just the security of the premise.  We'd be
17     able to -- easier to secure the premise if there was
18     no one here.  So he finally agreed to get up and
19     leave.
20  Q  Just so the record's clear.
21     That's Apartment Number 24 at 14 Pearl Street?
22  A  14 Pearl Street, correct.
23  Q  I'm going to show you two packets of documents.
24     First is a search warrant for 14 Pearl Street.  It's
```