UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
           v.                       )   CRIMINAL NO. 05-10129-NG
                                    )
MALDEN BATTLE                       )
_____)

**GOVERNMENT'S OPPOSITION TO
DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE**

The United States of America, by and through its attorney, the United States Attorney for the District of Massachusetts, hereby submits its Opposition to Defendants' Motions to Suppress Evidence ("Motion") filed by Defendant Malden Battle ("Battle") on January 9, 2006. As explained below, this Court should deny the defendant's motion because it lacks merit.

**I.   FACTS[1]**

On September 2, 2004, Odemira Rosa ("Rosa") went to the Boston Police Department, District 11, and spoke to Officer John Teixeira ("Teixeira.") Although Teixeira and Rosa were not friends, they were acquainted from the community and had spoken to each other before on more than one occasion. It was 8:30 a.m. and Rosa had come directly from work, having worked the overnight shift. Teixeira is a Cape Verdian Creole speaker and spoke to Rosa in Rosa's native language.

Rosa said that on August 21, 2004, less than two weeks before, he went to the apartment of Helena Fonseca ("Fonseca"), the mother of his four month old child. Rosa let himself in as

---

[1]   The government anticipates that these facts and others will be elicited at the hearing of this motion.

Fonseca had given him his own set of keys to the apartment.  Rosa was unexpectedly confronted by an unknown man, later identified as Battle, in Fonseca's bedroom.  Rosa described Battle as a black male with braided hair, approximately six feet tall.  An argument ensued and Battle approached Rosa with a gun in his hand.  Although Battle did not point the gun at him, Rosa was alarmed and left the apartment.

Rosa and Fonseca reconciled in the following days and Fonseca requested that Battle take his things and leave her apartment permanently.  Fonseca was scared and did not want to have anything to do with Battle.  However, Fonseca had given Battle a key to the building and apartment and, in the following days, he kept coming over.  From August 21, 2004 through September 2, 2004, Battle did not vacate the apartment entirely and Fonseca, frightened by his possession of the firearm, stayed with Rosa.

At approximately 10:00 p.m., on the night of September 1, 2004, Rosa went to the apartment to see if Battle had vacated it.  Rosa used his own set of keys.  Rosa looked in a closet and found an unfamiliar black bag.  He picked up the bag and a gun fell out.  According to Rosa, the firearm that fell out of the bag was not the firearm he saw Battle holding on August 21, 2004.  Rosa returned the firearm to the bag and left the apartment.  Rosa was due to work an overnight shift that evening, but went directly to the police station the following morning when he got out of work.

After interviewing Rosa, the police mobilized eight officers to the apartment.  Rosa accompanied the officers to the apartment building in order to unlock it.  Rosa gave the police his keys in the event that no one was in the apartment.  Two officers were stationed in front of the building and two in the back when Sergeant Detective Paul Donovan ("Donovan") knocked

on the apartment door accompanied by three other officers, two of whom were in uniform. Battle answered the door, bare chested and without shoes or socks. Upon seeing the uniformed officers, without prompting, Battle immediately said that he had permission to be in the apartment by his girlfriend. Donovan directed Battle to step outside the door, so the officers could do a protective sweep of the apartment.

Teixeira was stationed with Battle during the sweep when Battle called Fonseca on his cellular telephone and told her the police were at her home. Donovan returned from the sweep while they were on the telephone and told Battle to tell Fonseca to come back to the apartment.

At this point, the police still did not know Battle's identity and Battle was partially undressed without shoes. Donovan and other officers, including Officer Gerald Cahill ("Cahill"), accompanied Battle into the living room where he sat down on the couch. The front door opened into the living room and the couch was within eight feet of the door. Battle was advised of his rights per <u>Miranda</u> and was then asked a name. Battle indicated to Donovan that he was moving out of the apartment. He had arrived at 3:00 a.m. earlier that morning and had moved his belongings into his car. He then came back to the apartment and remained. At some point during this exchange, Battle called an attorney and left a message. Battle then informed the officers that he did not want to speak to them anymore.

Donovan did not ask Battle any other questions, but told Battle that he would have to leave the apartment and that the police were going to be conducting a search of it. Battle indicated that he did not want to leave. Donovan further emphasized that Battle could not stay and the police were going to secure the apartment until they could get a search warrant.

During this conversation, Battle was seated on the couch. Cahill was in the room as well

3

and observed Battle stand up. When Battle moved from the couch, Cahill noticed a white sock with a dark object on top of it under the couch. Cahill looked closer and identified it as a firearm.

By this point, Battle was dressed and was escorted out of the apartment by Donovan. While Battle was still in the hallway, however, Cahill indicated to Donovan his observation and Donovan came back to the living room and saw the firearm. Donovan then directed that Battle be handcuffed.

After further conversations with the officers, but before Fonseca had arrived, Donovan decided to take the handcuffs off of Battle. Once Fonseca arrived, however, and saw the firearm on the living room floor, she told officers that she had seen Battle with it on two previous occasions. Battle was then arrested and transported to the station. Although the police had already planned to get a warrant, they included the firearm under the couch in the affidavit. The police were granted a search warrant of the apartment and Battle's car.

**II.    ARGUMENT**

A.    <u>Police were given consent to enter the home.</u>

Rosa explained to the police that the owner of the home, Fonseca, was his girlfriend and mother of his child. She had been sleeping at Rosa's home since the August 21, 2004 incident where Battle threatened Rosa with a gun. Rosa had a key to the apartment that had been given to him by Fonseca. He accompanied the officers to the apartment to let them into the building and gave them his keys in the event that no one was in the apartment.

Rosa's escort to the building and handing police the keys to the apartment certainly amounts to consent to their entry. Any observations made while inside are therefore admissible.

B. <u>Defendant does not have standing to object to the police presence in Fonseca's home</u>.

Battle was not an invited guest in the home. In fact, Fonseca indicated that she wanted him out, but that he kept coming back. She was so concerned about his presence and her safety that she left the apartment. Rosa's stop at the apartment was to see if Battle and his belonging were not there anymore.

That Battle was not welcome in the home was further indicated by his own actions. Without being prompted, he immediately, and defensively, told police he had the right to be there. Battle's spontaneous statement only corroborated Rosa's information that Battle was not suppose to be in the home. Further, Battle indicated that he had no belongings in the home, having moved them to this car.

Where Battle was an unwanted guest in the home and had no possessory right to it, then he has no expectation of privacy in the home. <u>United States v. McCarthy</u>, 77 F.3d 522, 535 (1996) (where defendant had been told he had to leave premises by owner and defendant did not leave, then no legitimate expectation of privacy); <u>cf</u>. <u>United States v. Rahme</u>, 813 F.2d 31, 34-35 (2d. Cir. 1987) (hotel guest had no expectation of privacy in luggage left in room when, because of arrest, he defaulted on rent due.)

C. <u>Probable Cause for a warrant existed once Battle made statements corroborating Rosa's information allowing for the police to do a protective sweep of the apartment and "freeze" it so that evidence was not destroyed.</u>

The police had received information from Rosa, in person, that within the last two weeks, and most recently, less than 12 hours before, there were two different guns in the home. Further, Rosa indicated that Fonseca had requested that Battle leave the home, but it appeared that he was still there. Rosa described Battle as a black male, braided hair and approximately six feet tall.

Rosa's credibility was buttressed by the fact that he accompanied the police to the building to let them inside. In addition, Teixeira was previously acquainted with Rosa from the community.

An individual matching Rosa's description answered the door. Upon seeing uniformed officers, Battle, spontaneously and without prompting, defensively indicated that he had permission to be in the home from his girlfriend. Battle's statement further corroborated Rosa's information that the apartment was not Battle's, it was Fonseca's, and that Battle was not suppose to be there. Significantly, Battle did not tell the police that they could not come inside, further suggesting to the police that he had no standing to be in the home.

At that moment, the police had probable cause to search the home. They received information from a credible source that an individual matching Battle's description was living in the home without the owner's permission. Further, that Battle had threatened Rosa with a gun less than two weeks before and that Rosa had seen a second gun in the home the previous evening. In addition, Battle's own statements suggested that his presence in the home may have been in dispute, further corroborating Rosa's statements.

    1.    <u>The protective sweep was lawful</u>.

The police then conducted a protective sweep of the home and told Battle that he would have to leave because they were getting a search warrant. In <u>United States v. Taylor</u>, 248 F.3d 506 (6th Cir. 2001), the Court held that a protective sweep by officers securing an apartment while waiting for a warrant where officers had probable cause to search the apartment prior to entering was lawful. The Court clarified, however, that the protective sweep was limited to ensure the safety of those officers left behind, and must adhere to the standards set forth in <u>Maryland v. Buie</u>, 494 U.S. 325 (1990). In <u>Buie</u>, the Court held:

>The Fourth Amendment would permit a protective sweep where "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger . ."

Id. At 334.

Here, the officers had credible information that two firearms were in the home within the last two weeks. They knew that Battle did not have permission to be in the home, but was there nonetheless. In addition, Battle had threatened Rosa with the gun. These facts support the inference that not only was Battle dangerous, but there may have been another person in the home, other than Battle, who was also a potential danger warranting a protective sweep.

The discovery of Battle himself was also pursuant to the protective sweep. However, Battle was not willing to leave and his presence presented a safety hazard for the police. Consequently, Donovan told Battle he would have to leave the apartment while the police were freezing the home in anticipation of receiving a search warrant. Battle's state of undress prevented Battle's immediate departure and Battle was given an opportunity to dress.

That the police accompanied Battle inside was reasonable. They had information that Battle had been in possession of two guns within the last two weeks. The police knew that one of the guns was likely still in the home. They could not allow Battle to go back in the home unaccompanied to dress. Where safety was an issue, the police were reasonable in providing Battle a constant escort until he was removed from the area. As a result, Officer's Cahill's presence in the living room with Battle was lawful and his observations of the firearm in plain view could be included as part of the affidavit for the search warrant.

      2.    <u>The police appropriately secured the apartment.</u>

In <u>United States v. Dessesaure</u>, 429 F.3d 359 (1st Cir. 2005), police officers entered a home in order to "freeze" it in anticipation of receiving a search warrant. Officers entered the home with the defendant's key, encountered the defendant's girlfriend, and observed contraband in plain view. <u>Id</u>. at 364. The contraband was included in the application for a search of the home later in the day. <u>Id.</u> In finding that the officers' presence inside the home was unlawful for purpose of "freezing" it while waiting for the warrant, the First Circuit commented favorable on the district court's strong language regarding the law on "freezing" a scene:

> There is no question that the police had no right to "freeze" the Quincy apartment where that meant entering it, looking around, searching, all the while ostensibly waiting for someone to get a warrant. Nothing in the First Circuit or Supreme Court case law remotely justifies such a step. Nor should it.

<u>Id.</u> at 370.

The facts here are quite dissimilar to <u>Dessesaure</u>. Officers were present in the home for the purpose of getting Battle out of it. It was Battle's reluctance to leave that kept the officers inside the home. Once Battle left, and the place was secured, the officer would have waited for the warrant to arrive and then conducted a search. The officers were not searching for contraband before the "freezing" of the apartment. It was Battle's action that brought their attention to the couch. Had Battle left immediately, they would not have seen the firearm.

    D.    <u>Probable Cause existed to search even without the firearm</u>.

Even if this court were to determine that the firearm under the couch was unlawfully included in the search warrant affidavit, there is still probable cause to believe that firearms and ammunition would be found at the apartment. Pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154

(1978), the court should excise the offending information and evaluate whether what remains is sufficient to establish probable cause. Information from a reliable identified individual that two guns were located in the apartment, and one of the guns was observed there as recently as 12 hours before, provided strong evidence that the guns would still be there. Furthermore, an individual matching Rosa's description answered the door in state of undress stating, unbelievably, that he had permission to be there. This amounted to probable cause.

In United States v. Murray, police officers, after conducting an illegal search of a warehouse, obtained a search warrant for that warehouse, although the information observed during the illegal search was not included in the affidavit for the warrant, and rested on separate information. United States v. Murray, 487 U.S. 533, 535-536 (1988). Murray held that the "ultimate question" was "whether the search pursuant to the warrant was in fact a genuinely independent source of information and tangible evidence." The First Circuit has refined the Murray analysis regarding the independent source to be whether "the agents decision to seek the warrant was prompted by what they had seen during their initial entry." Dessesaure at 367.

Like the facts in Dessesaure, police officers informed Battle that they intended to seek a search warrant before they saw the gun. Indeed, it was during the effort to get Battle to leave the apartment in anticipation of the warrant that they saw the firearm. Therefore, it is difficult to suggest that their decision to seek the warrant was prompted by their observations. It was not.

E.   The firearm would have been discovered inevitably.

In United States v. Silvestri, 787 F.2d 736 (1st Cir. 1986), the First Circuit applied the inevitable discovery exception to a situation in which the police first found drugs during an illegal search of a garage and later began the application for a search warrant and received one,

9

resulting in the seizure of the drugs. The issue on appeal was whether the drugs first observed during the illegal initial entry were admissible.

The First Circuit held that where probable cause existed to obtain a search warrant prior to the entry and police did ultimately obtain a warrant, a search warrant for the garage would have inevitably have been sought and issued even had the illegal search never taken place, and consequently, the evidence initially found during the illegal entry was admissible.

Unlike Silvestri, the affidavit in our case included the firearm that is the subject of the initial search. However, the inevitable discovery theory allows for excising of the tainted information pursuant to Franks, see discussion infra, and an analysis resulting in probable cause. See United States v. Ford, 22 F.3d 374 (1st Cir. 1994) (drugs observed during initial unlawful entry would have been inevitably discovered putting aside police observation of drugs in the probable cause analysis of warrant affidavit.)

## II.  CONCLUSION

The touchstone of the Fourth Amendment is reasonableness.  Faced with a partially undressed man, reluctant to leave the premises where police have credible information that two firearms were located, the police were reasonable in escorting Battle inside the apartment to dress and leave.  It would have made little sense to make Battle leave when he was in the hallway without shoes, a shirt and his belongings.  However, when inside the apartment again, Battle refused to leave.  Physically forcing him out would have been a poor decision, and police made the better choice in persuading him to go.  Any observations made during this time should be admissible as the police presence in the apartment was lawful.

          Respectfully submitted,

          MICHAEL J. SULLIVAN
          United States Attorney

By:   /s/ Kimberly P. West
       KIMBERLY P. WEST
       Assistant U.S. Attorney

DATED: January 24, 2006

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney for defendant Malden Battle, Eileen M. Donoghue, 112 Middle Street, Lowell, MA 01852 on January 24, 2006 by first class mail and electronic mail.

          /s/ Kimberly P. West
          Kimberly P. West
          Assistant U.S. Attorney