**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.            ) | Docket No. 05-cr-10129-NG |
| ) | |
| MALDEN BATTLE,         ) | |
| _____Defendant._____) | |

GERTNER, D.J.

<u>**MEMORANDUM AND ORDER RE: MOTION TO SUPPRESS**</u>
May 18, 2006

**I.    INTRODUCTION**

The defendant, Malden Battle ("Battle"), has moved to
suppress evidence obtained from a warrantless entry by police
into the apartment in which he was staying on September 2, 2004.
He has also moved to suppress evidence seized during a subsequent
search pursuant to a warrant.

I held a suppression hearing on February 9 and 15, 2006.  As
a result of that hearing, I conclude that the motion to suppress
[docket entry #17] is **DENIED**.

**II.   FACTUAL BACKGROUND**

Defendant Malden Battle is charged with possession of
cocaine with intent to distribute and possession by a felon of a
firearm and ammunition.  His arrest, and the present motion to
suppress, stem from a police entry into an apartment at 14 Pearl
Street, Dorchester, Massachusetts, in which he was staying on
September 2, 2004.

On the morning of September 2, Boston Police received a tip from one Odemira Rosa ("Rosa") that Malden Battle was in Rosa's girlfriend's apartment, and that he had a gun.  Rosa's girlfriend, Helena Fonseca ("Fonseca"), lived at 14 Pearl Street with her two young children, one of whom is Rosa's son.  Though Rosa lived elsewhere, he had his own key and unlimited access to 14 Pearl Street, and spent significant time there.  During a hiatus in Rosa's and Fonseca's relationship in the summer of 2004, however, Fonseca began seeing Battle, who occasionally stayed with her at her apartment.

On August 21, 2004, Rosa went to 14 Pearl Street and entered the apartment using his own key.  Inside, he discovered Fonseca and a man whom he later identified as Battle.  Battle confronted Rosa with a gun, and Rosa left the apartment.

Battle's and Fonseca's relationship ended after this incident, and Fonseca told Battle that he could no longer stay at the apartment.  Battle, however, continued to call Fonseca.  Scared by Battle's repeated phone calls, Fonseca and her children left the apartment and moved in temporarily with Rosa.

On September 1, 2004, Rosa returned to 14 Pearl Street to ensure that Battle was no longer staying there.  He entered with his own key, and, though Battle was not in the apartment, found a gun in a black bag in the closet.

At approximately 8:30 the following morning, September 2, 2004, Rosa went to the Dorchester police station and spoke with Officer John Teixeira, an acquaintance who speaks Cape Verdean Creole, Rosa's first language.  Rosa recounted to Teixeira his discovery of the gun at 14 Pearl Street, as well as his August 21, 2004, encounter with Battle, whom he described as a black male, six feet tall, with braids.  He also told Teixeira that, though the apartment at 14 Pearl Street was in Helena Fonseca's name, Rosa paid the rent and had a key and unlimited access.  He offered to accompany Teixeira to the apartment and open the doors with his key.

After speaking with Teixeira, Rosa spoke with Sergeant Detective Paul Donovan, using Teixeira as a translator.  He told Donovan about the man and the gun at 14 Pearl Street.  He also informed Donovan that he had a key and unrestricted access to the apartment.

At approximately 10:30 am, Rosa accompanied Donovan and Teixeira, along with six other police officers, to 14 Pearl Street.  He opened the building door for the police and waited on the floor below while the police proceeded to Fonseca's apartment.

Sergeant Donovan knocked on the apartment door, and a man who fit Battle's description came into the hallway.  He

immediately stated that he had permission from his girlfriend to be in the apartment.

While Teixeira stayed with Battle in the hallway, Donovan and other officers conducted a "protective sweep" of the apartment.  Meanwhile, Battle called Fonseca from his cell phone, and the police instructed her to come to the apartment.

After the sweep, during which nothing was found, Donovan, the other officers, and Battle entered the apartment.[1]  They sat in the living room, with Battle on the couch.  After an officer read Battle's <u>Miranda</u> rights, Battle identified himself, said he was in the process of moving out, and stated that he had already packed some of his belongings in his car parked outside.  He then called his attorney and stated that he did not want to speak any more.

The police stopped questioning Battle, but told him he needed to leave the apartment so they could "freeze" it while they obtained a search warrant.  As Donovan escorted Battle out of the apartment, Officer Gerald Cahill noticed and retrieved a gun beneath the living room couch.

Fonseca then arrived at the apartment.  Using Teixeira as a translator, she confirmed that the gun belonged to Battle, and

---

[1] The details of the crossing of the threshold are unclear.  Sergeant Donovan testified, "I don't know how exactly it occurred, whether I invited him or we went back in.  I believe he had a wallet and some identification, if I recall correctly, and he was showing us that identification."  (Suppr. Hr'g Tr. 68, 7-10, Feb. 9, 2006).

that she had seen him with it on prior occasions.  The police arrested Battle, handcuffed him, and transported him to the police station.

Later that day, the police obtained a search warrant, using an affidavit that included the gun found under the couch.  They searched the apartment and Battle's car and found another gun, a ballistics vest, boxes of ammunition, a bag containing three small bags of cocaine, $2,982.00 in U.S. currency, various clothes, Battle's personal papers and photos, and receipts in Battle's and Fonseca's names.

Battle has moved to suppress all items seized from the apartment and the car.

## III. **ANALYSIS**

### A.   **Legal Standards**

As the Supreme Court has recently reiterated, the Fourth Amendment provides "special protection" for the privacy of the home.  <u>Georgia v. Randolph</u>, No. 04-1067, 2006 U.S. LEXIS 2498, at *23 n.4 (Mar. 22, 2006); <u>accord</u> <u>Johnson v. United States</u>, 333 U.S. 10, 14 (1948) ("The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.").  Warrantless entries into the home are presumptively unreasonable, unless they fall within "one of a carefully defined set of exceptions . . . ."  <u>Payton v. New</u>

York, 445 U.S. 573, 587 (1980).  One such exception is the voluntary consent of a party with actual or apparent authority to give such consent; another is the presence of exigent circumstances justifying entry.  Id.; Randolph, 2006 U.S. LEXIS 2498, at *12.  The government bears the burden of proving that a warrantless entry is justified by an exception to the Fourth Amendment's warrant requirement.  Coolidge v. New Hampshire, 403 U.S. 443, 455 (U.S. 1971).

Once officers are legitimately inside a home, they may seize evidence that is "in plain view" without a warrant.  Id. at 465. The boundaries of the plain view doctrine are tightly drawn, however.  Officers are prohibited from taking any action, "unrelated to the objectives of the authorized intrusion, which expose[] to view concealed portions of the apartment or its contents . . . ."  Arizona v. Hicks, 480 U.S. 321, 325 (U.S. 1987).

In the case at bar, the question of *entry* is the proper focus of this Court's analysis.  If the police were inside the apartment at 14 Pearl Street legitimately, Cahill's discovery of the gun is acceptable under the "plain view" doctrine.

**B.   Standing**

Before proceeding to an analysis of the officers' entry into the apartment and discovery of the gun, however, it is necessary

to examine whether Battle has standing to make the present Fourth Amendment challenges.

The Supreme Court has explained that the question of "standing" in the Fourth Amendment context is a question of privacy expectations.  <u>Minnesota v. Olson</u>, 495 U.S. 91, 95 (1990) ("[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.").  In this case, then, did Malden Battle have a legitimate expectation of privacy in Helena Fonseca's apartment on September 2, 2004?

At the February 15, 2006, evidentiary hearing on Battle's motion to suppress, Fonseca testified that, on August 21, 2004, she told Battle to leave her apartment.  She stated, "I told Malden to go on, to go to his house, and I told him don't come back anymore because I have two kids in this house, I don't want you here anymore."  (Suppr. Hr'g Tr. 11, 22-25, Feb. 15, 2006). She also testified that, on September 2, 2004, when Battle called her from the hallway at 14 Pearl Street, she asked, "[W]hat are you doing at my house?  I don't want you at my house. . . I didn't tell you you could go to my house."  <u>Id.</u> at 12, 19-23; 13, 1-3.  Though Battle told the police when they arrived on September 2 that he had permission to be in the apartment, Fonseca's sworn testimony directly contradicts this statement.

7

On the day of the police entry into the apartment, therefore, Battle was no longer welcome at 14 Pearl Street.  He was no longer an invited guest, or even a "guest" at all, but rather a trespasser who remained in the apartment after Fonseca instructed him to leave.  The First and Second Circuits have held that a guest who has refused to leave a home has little or no expectation of privacy and no standing to challenge a police entry into that home.  United States v. McCarthy, 77 F.3d 522, 535 (1st Cir. 1996) ("Moreover, McCarthy's legitimate expectation argument is further undercut by the fact that he left the open suitcase in Henderson's trailer after Henderson told McCarthy that he and Hunter had to leave.") (citing United States v. Rahme, 813 F.2d 31, 34-35 (2d Cir. 1987) (hotel guest had no expectation of privacy in luggage left in room when, because of his arrest, he defaulted on rent due)).

The Supreme Court's reasoning in Minnesota v. Olson, extending the Fourth Amendment's protections to an "overnight guest" also supports this conclusion.  In Olson, the Court commented, "The houseguest *is there with the permission of his host*, who is willing to share his house and his privacy with his guest."  495 U.S. at 96-99 (emphasis added).  In the case at bar, on August 21, 2004, Fonseca revoked her permission for Battle to occupy her apartment.  When the police arrived on September 2, he could no longer claim an expectation of privacy at 14 Pearl

Street, and therefore has no standing to raise Fourth Amendment objections to the police entry into the apartment and discovery of the gun.

## C.   Consent

Yet even if Battle had standing, his motion to suppress would still fail, as Rosa's interactions with the police constituted third party consent to their entry into the apartment.

The First Circuit has explained that a third party may permit the police to enter a home.  A court must inquire, however, into that party's authority:

> The authority which justifies third-party consent to search rests upon *mutual use of the property by persons generally having joint access or control for most purposes*, so that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.[2]

---

[2]  Courts have expanded this rule beyond "co-habitants" to include third parties who are not residents of a home, but who nevertheless have the joint access or control that are the linchpins of the authority analysis.  See, e.g., United States v. Broaden, No. 96-10439, 1997 U.S. App. LEXIS 15327 (9th Cir. June 23, 1997) (babysitter had authority to consent to a search); United States v. Punzo, No. 03-1075, 2004 U.S. Dist. LEXIS 20684 (N.D. Ill. Oct. 19, 2004) (father had authority to consent to search of son's home).

United States v. Jimenez, 419 F.3d 34, 40 (1st Cir. 2005)

(emphasis added) (citing United States v. Matlock, 415 U.S. 164,

171 n.7 (1974)).[3]

A third party may have one of two types of authority to
consent: actual or apparent.  Even if a third party does not have
the joint access or control required for *actual* authority, a
warrantless entry may nevertheless be valid if the police
reasonably believe in that person's authority to consent.  In
Illinois v. Rodriguez, the Supreme Court established this
doctrine of "*apparent* authority," asking, "[W]ould the facts
available to the officer at the moment . . . warrant a man of
reasonable caution in the belief that the consenting party had
authority over the premises?"  497 U.S. 177, 188 (1990).

Finally, regardless of whether a consenting person has
actual or apparent authority, the consent he or she gives must be
voluntary.  Randolph, 2006 U.S. LEXIS 2498, at *37 (discussing
the need to ensure voluntariness).

---

[3] The Supreme Court's recent opinion in Georgia v. Randolph, No. 04-
1067, 2006 U.S. LEXIS 2498, at *23 n.4 (Mar. 22, 2006), may cast doubt on the
"assumption of the risk" rationale for the third party consent doctrine.  In
Randolph, the Court's analysis hinged on the "commonly held understanding"
that one co-tenant may not consent to a search over another tenant's
objection.  Instead of focusing on the tenants' diminished privacy expectation
in their shared space and assumption of the risk that one of their number
would consent to a search, the Court examined "widely shared social
expectations" that one tenant's decision concerning consent cannot trump
another's.  The Court, however, confined its holding to the set of
circumstances present in the case before it: two present co-tenants, one
objecting and one consenting to a search.  On its face, then, Randolph does
not overrule the line of cases concerning third party consent.  The extent to
which it has undermined, or perhaps shifted, the rationale underpinning those
cases is yet to be determined.

Thus, this Court must inquire into both the nature of Rosa's authority and the nature of his consent.

### 1.   **Actual or Apparent Authority**

Courts have examined multiple factors in evaluating a third party's actual authority to consent to police entry into a home, including, but not limited to, present or prior residency at that home, access to the home, possessions kept at the home, payment of bills at the home, and relationship to the other residents of the home. See, e.g. United States v. Salimonu, 182 F.3d 63 (1st Cir. 1999) (girlfriend had actual authority when she was authorized in the defendant's absence to move his belongings out of his apartment); United States v. Hyson, 721 F.3d 856 (1st Cir. 1983) (third party had actual authority when he lived for five weeks  in an apartment rented, but not occupied, by defendant); United States v. Evans, 27 F.3d 1219, 1230 (7th Cir. 1994) (father had actual authority when he owned a two-bay garage, paid its utility bills, and had access to the garage bay used exclusively by his son); United States v. Trzaska, 859 F.2d 1118 (2d Cir. 1988) (estranged wife had actual authority when she had her husband's apartment key and permission to allow access to others); Punzo, 2004 U.S. Dist. LEXIS 20684 (father had actual authority when he had keys and unlimited access to son's house in son's absence).

Mistakes by the police in assessing these indicia of actual authority may give rise to a finding of apparent authority.  <u>See</u>, <u>e.g.</u>, <u>United States v. Meada</u>, 408 F.3d 14 (1st Cir. 2005) (estranged girlfriend had apparent authority when she kept personal possessions in the defendant's apartment, had lived there recently, and could enter without the defendant); <u>United States v. Hudson</u>, 405 F.3d 425 (6th Cir. 2005) (estranged girlfriend had apparent authority when she had a child with the defendant, had lived at his home, and had a key); <u>United States v. Chaidez</u>, 919 F.2d 1193 (7th Cir. 1990) (girlfriend had apparent authority when she spent time at the defendant's apartment, paid the utility and phone bills, and could allow access to others); <u>but</u> <u>see</u> <u>Riley v. Gray</u>, 674 F.2d 522, 528 (6th Cir. 1982) (no apparent authority when third party did not live at the defendant's apartment, was not a regular visitor, did not have regular possession of the keys, and did not have permission to enter when the defendant was not there); <u>see</u> <u>also</u> <u>United States v. Santiago</u>, No. 04-10336, 2005 U.S. Dist. LEXIS 32657 (D. Mass. Nov. 2, 2005) ("[H]aving access to a place and even some ownership interest in possessions within that place is insufficient to establish actual authority.").

In the case at bar, Rosa, Officer Teixeira, and Sergeant Donovan all testified that Rosa told Teixeira, and later Donovan, that he spent significant time at the 14 Pearl Street apartment.

(Suppr. Hr'g Tr. 8, 5-23, Feb. 9, 2006).  Teixeira testified that
Rosa told him that he "used to stay there on and off."  <u>Id.</u> at
35, 19-21.  Though Rosa's name was not on the lease, he told
Teixeira that he paid the rent.  (Suppr. Hr'g Tr. 62, 7-8, Feb.
15, 2006).  He also stated that he had the key and unrestricted
access to the apartment, and was in fact able to open the door
for the officers.  (Suppr. Hr'g Tr. 41, 18-25; 42, 1-24, Feb. 9,
2006; Suppr. Hr'g Tr. 52, 6-9, Feb. 15, 2006).

On the basis of this testimony, I conclude that, even if
Rosa's connections to the apartment at 14 Pearl Street did not
satisfy the actual authority test, he provided Teixeira and
Donovan with enough information to lead them reasonably to
believe that he had joint access to or control over the apartment
at 14 Pearl Street.  Rosa therefore had apparent, if not actual,
authority to consent to the warrantless entry into Fonseca's
apartment at 14 Pearl Street, and did provide such consent.[4]

### 2.  <u>Voluntariness</u>

In order to justify the police officers' warrantless entry,
the government must also prove that Rosa's consent was voluntary.

---

[4] Sergeant Donovan's testimony that he did not "have permission to
conduct a search or consent to conduct a search" does not undermine this
conclusion.  (Suppr. Hr'g Tr. 65, 8-10, Feb. 9, 2006).  First, it is unclear
from the context to whose consent Donovan is referring: Battle's, Fonseca's or
Rosa's.  Second, further testimony by Donovan establishes that he did have,
and did not believe he needed, *Battle*'s consent to enter into and remain in
the apartment.  <u>Id.</u> at 68, 20-25.  Third, and finally, the relevant question
to this analysis is not whether the police believed they had consent to
conduct a *search*, but rather whether Rosa had the authority to give consent,
and had given that consent, to *enter* the 14 Pearl Street apartment.

Randolph, 2006 U.S. LEXIS 2498, at *37.  There is little
controversy surrounding this point: Rosa testified that he went
to the Dorchester police station on September 2, 2004, offered to
escort the police to 14 Pearl Street, and opened the door of his
own accord.  (Suppr. Hr'g Tr. 52, 6-21, Feb. 15, 2006).  There is
no indication in the record that Rosa's consent to the police
entry into the apartment was anything but voluntary.

Because Rosa had apparent, if not actual, authority to give
consent, and because his consent was voluntary, therefore, the
warrantless entry into Fonseca's apartment was constitutional.

D.  **Plain View**

Once the police were inside the apartment, their discovery
of the gun beneath the living room couch is justified by the
"plain view" doctrine.  Cahill testified that he noticed the gun,
sitting atop a white sock, under the couch.  According to Cahill,
neither he nor any other officer moved the couch in order to
search for the gun; he merely "tilted [his] head a little down"
and saw what he recognized as "a black firearm." (Suppr. Hr'g Tr.
68, 1-4, Feb. 15, 2006).[5]  The gun is therefore admissible.

---

[5] Donovan testified that the couch "had been moved from the position it
had been in when the gentleman [Battle] got up from the couch." (Suppr. Hr'g
Tr. 54, 1-7, Feb. 9, 2006).  It is unclear from this testimony whether the
couch was moved as a result of Battle's sitting on, and getting up from, it,
or whether the police moved the couch in order to retrieve the gun after
Cahill noticed it.  Neither interpretation of this testimony presents the
problem of overreaching that was at issue in Olson.  If the couch moved as a
result of Battle's own movements, the gun legitimately came into Cahill's
"plain view."  If the police moved the couch in order to retrieve the gun,
this movement does not constitute the type of search deemed unconstitutional
in Olson, but rather was part and parcel of the permissible police seizure of

Moreover, because the police discovered the gun in plain view, they were also justified in using it in their affidavit in support of the search warrant they ultimately obtained.  Though it is true, as the defendant argues, that a search warrant may be tainted if the police include illegally seized evidence in their affidavit, the warrant in the case at bar, and the search conducted pursuant to that warrant's authority, was not so tainted.  See United States v. Murray, 487 U.S. 533 (1988) (discussing "tainted" warrant affidavits).

The police entry into the apartment, their discovery of the gun beneath the couch, and their subsequent search pursuant to a warrant were therefore constitutional, and the evidence they obtained is admissible.

### E.   Government's Remaining Arguments

Because I conclude that Battle's motion to suppress fails on standing, consent, and plain view grounds, a full analysis of the government's three remaining arguments against suppression is not necessary.[6]

_____

the gun once Cahill noticed it.

[6] The government argues in the alternative that the police were permitted to enter the apartment to conduct a protective sweep or to "freeze" the apartment while awaiting a search warrant.  The government also contends that a warrant was unnecessary at the time of the entry into the apartment because the police inevitably would have discovered the gun beneath the couch and the other items they seized.

I will, though, briefly address the government's "protective sweep" argument, in order to call attention to the ways in which police officers, and, by extension the prosecution, impermissibly stretch this "carefully defined" exception to the Fourth Amendment's warrant requirement. <u>Payton</u>, 445 U.S. at 587; <u>see also</u> <u>United States v. Matthews</u>, No. 05-10073, 2006 U.S. Dist. LEXIS 7701, at *2 (D. Mass. Mar. 1, 2006) (noting that police "invoked words like 'protective sweep' and 'exigent circumstances' to justify their search, but these phrases are meaningless mantras unless they are connected to supporting facts").

### 1. __Protective Sweep__

Sergeant Donovan testified, and the government argued, that the officers' initial, warrantless entry into the 14 Pearl Street apartment was necessary in order to perform a protective sweep, carried out to ensure the officers' safety. On the facts of this case, however, the protective sweep justification does not apply. Officers may conduct a protective sweep of a home under a limited set of circumstances. First, their entry into the home must be constitutional. <u>United States v. Martins</u>, 413 F.3d 139, 150 (1st Cir. 2005) ("[P]olice *who have lawfully entered a residence* possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry." ) (emphasis added). Second,

they must be able to articulate facts that support their belief
that the home "harbors an individual posing a danger" to the
officers on the scene.     Maryland v. Buie, 494 U.S. 325, 334
(U.S. 1990) ("[T]here must be articulable facts which, taken
together with the rational inferences from those facts, would
warrant a reasonably prudent officer in believing that the area
to be swept harbors an individual posing a danger to those on the
arres t scene.").

In the present case, though the police entry into the apart
ment was justified by Rosa's consent, the police have been unable
to articulate the kind of facts required by Buie to allow them to
sweep the apartment.  Sergeant Donovan testified that he had *no
information* that anyone other than Battle was inside the
apartment.  He stated, "I had a pretty good belief at that time
that there was a firearm located in that apartment.  I wanted to
determine that there were no other persons in the apartment that
may have access to that firearm . . . I did not have any other
information about anyone else in that apartment . . . ."  (Suppr.
Hr'g Tr. 46, 19-23; 47, 1-2, Feb. 9, 2006).

This testimony clearly runs afoul of the Buie rule.  As
another district court has observed, "[T]he officers' lack of
information or possession of no information concerning such a
possibility cannot supply the articulable basis needed for the
sweep in the first instance."  United States v. Fitzgerald, No.

17

04-320, 2006 U.S. Dist. LEXIS 10826 (D. Pa. Mar. 15, 2006);

(quoting <u>United States v. Colbert</u>, 76 F.3d 773, 778 (6th Cir.

1996) ("'No information' cannot be an articulable basis for a

sweep that requires information to justify it in the first

place.")).

In addition to failing to satisfy the <u>Buie</u> test, the police

in this case have improperly combined the separate requirements

of constitutional entry and articulable facts.  Indeed, Sergeant

Donovan referred to the need to conduct a protective sweep as the

reason for the initial, warrantless entry into Fonseca's

apartment.  (Suppr. Hr'g Tr. 46, 13-18, Feb. 9, 2006) ("[W]e

proceeded into the apartment, we conducted a protective sweep of

the apartment to determine if there were any other individuals in

the apartment.").

It is true that, in some cases, the articulable facts that

give rise to the belief that a dangerous person is hiding within

a residence might also constitute the exigent circumstances that

would require entry by the police.  The same set of facts would

justify both a warrantless entry and a protective sweep and

satisfy the two protective sweep requirements.  In the case at

bar, however, there were neither articulable facts nor exigent

circumstances, and Sergeant Donovan's reliance on the protective

sweep doctrine to justify his crossing of the threshold, as well

as his "sweep" of the apartment, is misplaced.

IV.  <u>CONCLUSION</u>

Though the government relies improperly on the protective sweep exception, its arguments concerning Battle's standing, Rosa's consent, and the plain view doctrine succeed. Accordingly, this Court **DENIES** the defendant's motion to suppress [docket entry #17].


**SO ORDERED.**

**Dated: May 18, 2006**                    <u>s/ NANCY GERTNER U.S.D.J.</u>